**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**Case No. 05-751C**
**(Judge Firestone)**

---

**CINCINNATI INSURANCE COMPANY,**

**Plaintiff,**

**v.**

**THE UNITED STATES**

**Defendant.**

---

# Response Brief of Plaintiff Cincinnati Insurance Company to the Defendant's Motion to Dismiss Or, in the Alternative, Motion for Summary Judgment

---

G. Bruce Stigger
Alber Crafton, PSC
Hurstbourne Place, Suite 1300
9300 Shelbyville Road
Louisville, KY 40222
Tel: (502) 815-5000
Fax: (502) 815-5005

Attorney of Record for
Cincinnati Insurance Company

# TABLE OF CONTENTS

I. STATEMENT OF FACTS .......... 1

II. ARGUMENT AND CITATION OF AUTHORITIES .......... 4

A. As This Court Has Jurisdiction Over This Matter, The Corps' Motion to Dismiss Must Fail .......... 4

B. A Surety, Having Performed Pursuant to Its Payment Obligations, Can Maintain An Action Against the United States for Wrongful Payment .......... 4

1. The Insurance Company of the West Decision Is Consistent with Tucker Act Jurisdiction for Suits by a Payment Bond Surety .......... 6

2. The Surety Can Enforce the Superior Equities of the Subcontractors It Paid .......... 12

3. Recent Court of Federal Claims Cases Do Not Support Defendant's Jurisdiction Argument .......... 14

4. Logic, Equity and Public Policy Support Rejection of the Government's Arguments .......... 16

C. Likewise, Defendant's Motion for Summary Judgment Must Be Denied Because the Corps Has Failed to Enter Most of the Evidence It Relies Upon in the Record .......... 19

1. The Corps' Motion for Summary Judgment Must Be Denied Because the Corps Has Failed to Enter Most of the Evidence It Relies Upon in the Record .......... 19

2. The Corps Cannot Meet the High Standards Necessary for Summary Judgment .......... 19

3. The Standard is Whether the Government Reasonably Exercised Its Discretion Conferred Upon It By Contract and Applicable Law/ Regulations .......... 20

III. CONCLUSION .......... 26

## Table of Authorities

### Cases

*Active Fire Sprinkler Corp. v. United States Postal Service*, 811 F.2d 747 (2nd Cir. 1987)......... 13

*American Insurance Co. v. United States*, 62 Fed. Cl. 151 (September 28, 2004)....................... 22

*Appeal of Indiana Lumberman's Mutual Insurance Co., Inc.*, 92-3 BCA 25,065 (VABCA 1992) ........................................................................................................................ 25

*Appeal of J.P. Inc.*, 90-1 BCA 22, 348 (ASBCA 1989) ............................................................ 25

*Argonaut Insurance Co. v. United States*, 193 Ct. Cl. 483, 434 F.2d 1362 (1970) .................. 6, 14

*Balboa Insurance Co. v. United States*, 775 F.2d 1158 (Fed. Cir. 1985) ............................. passim

*Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553 (1986) ................................ 19

*Cumbermans Mutual Cas. Co. v. United States*, 67 Fed. Cl. 253 (August 17, 2005).................. 23

*Fireman's Fund Insurance Co. v. United States*, 190 Ct.Cl. 804, 421 F.2d 706 (1970) ................ 6

*General Accident Ins. Co. v. United States*, 19989 U.S. Claims Lexis 337 (1998)...................... 25

*Great American Insurance Co. v. United States*, 203 Ct.Cl. 592, 492 F.2d 821 (1974) ................ 6

*H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed. Cir. 1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed. 2d 52 (1985)........................................................................ 20

*Hartford Fire Insurance Co. v. United States*, 40 Fed. Cl. 520 (1998) .......................................... 6

*Henke v. Untied States*, 60 F.3d, 795, 797 (Fed. Cir. 1995) ......................................................... 4

*Henningsen v. United States Fidelity & Guaranty Co.*, 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908)........................................................................................................................ 12, 13

*Home Indemnity Co. v. United States*, 180 Ct. Cl. 173, 376 F.2d 890 (1967)............................... 6

*Imperial Van Lines Intl. Inc. v. United States*, 821 F.2d 634, 637 (Fed. Cir. 1987)..................... 19

*Insurance Company of the West v. United States*, 243 F.3d 1367 (Fed. Cir. 2001) ............. passim

*Insurance Company of the West v. United States*, 55 Fed. Cl. 529, 534-538 (2003) .................. 11

*Integon Indemnity Corp. v. United States*, 12 Cl.Ct. 115 (1987)................................................... 6

*International Fidelity Insurance Co. v. United States*, 25 Cl. Ct. 469 (1992)............................... 6

*International Fidelity Insurance Company v. United States*, 41 Fed.Cl. 706, 711 (1998)............ 5

*J&E Salvage Company v. The United States*, 37 Fed. C1. 256, 260 (1997).................................. 4

*Janowsky v. U.S.*, 31 Fed. C1. 520, 521 (1994)................................................................... 4

*Jay v. Sec'y DHHS*, 998 F.2d 979, 982 (Fed. Cir. 1993)........................................................... 19

*Kennedy Electric Co. Inc. v. United States Postal Service*, 508 F.2d 954 (10th Cir. 1974).......... 13

*Lamb Engineering & Construction Co. v. United States*, 58 Fed. Cl. 106 (2003) ....................... 14

*Litchfield-Massaro, Inc. v. United States*, 17 C1.Ct. 67, 70 (1989) ........................................... 19

*Litton Indus. Prods. Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed. Cir. 1985)............. 20

*National Surety Corps v. U.S.*, 118 F.3d 1542 (1997)................................................................ 21

*North Denver Bank v. United States*, 193 Ct. Cl. 225, 432 F.2d 466 (1970) .............................. 14

*Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962).... passim

*Prairie State National Bank v. United States*, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896) 13

*Reliance Ins. Co. v. United States*, 15 Cl. Ct. 62 (1988)............................................................ 25

*Reliance Insurance Co. v. United States*, 15 Cl.Ct. 62 (1988) ...................................................... 6

*Thomas Creek Lumber and Log Co. v. United States*, 36 Fed. C1. 220, 234 (1996) .................. 20

*Uniq Computer Corp. v. United States*, 20 Cl.Ct. 222, 228-29 (1990)........................................ 20

*United Electric Corp. v. United States*, 227 Ct.Cl. 236, 647 F.2d 1082 (1981)................. 5, 10, 12

*United Pacific Insurance Co. v. United States*, 16 Cl. Ct. 555 (1989) .......................................... 6

*United States Fidelity & Guaranty Co. v. United States*, 16 Cl.Ct. 541 (1989) ............................ 6

*United States Fidelity & Guaranty Co. v. United States*, 201 Ct.Cl. 1, 475 F.2d 1377 (1973) ........ passim

*United States Fire Insurance Co. v. United States*, 61 Fed. Cl. 494 (2004) ........ 15

*United States v. Aetna Casualty & Surety Co.*, 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171 (1949) 7

*United States v. Munsey Trust Co.*, 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947) .. 9, 10, 12

*W.R. Cooper General Contractor, Inc. v. United States,* F.2d 1362, 1364 (Fed. Cir. 1988)......... 4

*Wright v. United States Postal Service*, 29 F.3d 1426 (9th Cir. 1994) ........ 13

**Statutes**

FAR §28.106-7 ........ 25

FAR §52.232-5 (48 C.F.R. §52.232-5) ........ 13, 24

Prompt Payment Act, 31 U.S.C. §3903(b)(1)(B) ........ 14, 18

**PLAINTIFF'S BRIEF**

## I. STATEMENT OF FACTS

.

In 2003, the United States Army Corps of Engineers ("Corps") entered into a construction contract with Lasker, Inc. ("Lasker"). The original contractual price was $1,811,000. Cincinnati, as surety, provided payment and performance bonds for the Project in the final sums of $1,811,000. Complaint, ¶ 3.

By letter dated May 20, 2004, the Corps notifies Lasker that it has received letters from Lasker's subcontractors complaining that they had not been paid for work on the Corps' Project. The Corps' Contracting Office's Representative notifies Lasker of the contract 's payment obligations with respect to subcontractor and how Lasker is apparently disregarding these obligations. The Corps also demands Laskers' subcontractors be paid within seven (7) days or that the Corps be provided with justification for this non-payment. A copy of this letter was also sent to Cincinnati and the U.S. Small Business Administration. Exhibit 1.

On June 17, 2004, Lasker submitted Pay Application No. 10 to the Corps requesting payment of $146,247.40. As of that time, the unpaid contract balance was $183,684.40 (approximately 10% of the contract amount) leaving $37,410 (or approximately 2% of the contract amount) to be held by the Corps as "Balance to Finish, Plus as the Retainer." Exhibit 2. This Pay Application was not paid.

On June 23, 2004, the Corps advised Cincinnati that it would pay the sum of $67,000 to Lasker but withheld $116,000 for close-out, punch-list and incomplete work. Exhibit 3.

By letter dated June 25, 2004, Cincinnati notified the Corps that it had received payment bond claims from several of Lasker's subcontractors on the Project including Central Industrial Electric Company and Confort Systems Inc. totaling about $400,000 – even though the unpaid contract balance for the Project at that time was only $183,687.40. Since it was apparent that Lasker had breached its payment obligations owing to its subcontractors as well as the Prompt Payment Act (31 USC 3905), Cincinnati requested the Corps to review its contract with Lasker and enforce the contract provisions relating to subcontractor payment. Additionally, Cincinnati stated that all consents of surety for payments to Lasker were immediately withdrawn. Exhibit 4.

By letter dated June 26, 2004, the Contracting Office's representative for the Corps notified Lasker that Lasker's Pay Application No. 10 was improperly submitted due to:

a. Lasker's requesting payment of 100% for activities which still require punch list work to be performed;

b. The unpaid contract balance was insufficient ". . . to protect government's interest for outstanding payments due subcontractors and/or suppliers";

c. Lasker's breach of contract by not paying subcontractors properly; and

d. False certification included with Pay Application No. 10.

The Corps also states that it will take no action on Lasker's Pay Application No. 10. However, Lasker would be allowed to re-submit the Pay Application upon satisfying the above-described problems. This letter was also faxed to Cincinnati on June 26, 2004. On July 26, 2004, Lasker submitted Revised Pay Application No. 10 for the slightly reduced amount of $116,395.80. Exhibit 5.

Without receiving any proof that Lasker had in fact remedied the numerous problems identified in the Corps' June 26, 2004 letter, Lasker nevertheless submitted Revised Pay

Application No. 10 (Exhibit 6) to the Corps and the Corps paid $106,447.50 to Lasker on August 4, 2004. The due date for such payment was August 10, 2004 but it was apparently electronically transferred by the Corps to Lasker's bank account on August 4, 2004. Exhibit 7.

As of mid August 2004, Lasker still owed substantial amounts to its subcontractors on the Project including $110, 149.00 to Central Industrial Electric Co. and $173,730.20 to Comfort Systems Inc. Cincinnati paid these subcontractors. Lasker's debts owed to these subcontractors in late August/early September 2004. Exhibit 8.

By letter faxed to the Corps on August 4, 2004, Lasker directs all payments due or to become due be forwarded to Cincinnati and Lasker encloses a fully executed "Assignment from Principal to Surety of Contract Rights & Proceeds, dated August 4, 2004. Exhibit 9.

On August 30, 2004, Cincinnati sends letter to Corps addressing the payment to Lasker and the Corps' mandate that payments would not be made without Lasker's compliance with its legal obligations owing to the Corps and its subcontractors. Cincinnati also requests that the Corps reimburse for the damages associated with the Corps improper payment to Lasker. Exhibit 10.

The Corps Contracting Officer responds on September 10, 2004 and advises Lasker that the Corps will not recover their payment from Lasker. Exhibit 11.

On February 11, 2005, Cincinnati submitted its certified claim to the Corps which was denied by the Contracting Officer on May 17, 2005. Exhibit 12.

The Corps' payment of $106,447.50 to Lasker, Lasker used only approximately $20,000 on debts incurred on the bonded Project. All other payment funds (approximately $86,000) paid to Lasker were spent on other Projects or debts. Exhibit 13.

As a result of the Corps' improper payment to Lasker, Cincinnati's rights have been prejudiced.

## II. ARGUMENT AND CITATION OF AUTHORITIES

### A. As This Court Has Jurisdiction Over This Matter, The Corps' Motion to Dismiss Must Fail.

This case is before the Court on the Corps' Motion to Dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) (as well as a motion for summary judgment). When evaluating a Motion to Dismiss pursuant to RCFC 12(b)(1), the Court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in Plaintiff's favor." *Henke v. Untied States*, 60 F.3d, 795, 797 (Fed. Cir. 1995), *J&E Salvage Company v. The United States*, 37 Fed. C1. 256, 260 (1997). If the facts demonstrate any means by which the non-moving party might prevail, the Court must deny the motion. *W.R. Cooper General Contractor, Inc. v. United States,* F.2d 1362, 1364 (Fed. Cir. 1988). Further, "where Defendant disputes merits-type issues in Motion to Dismiss for lack of jurisdiction, [the] Court of Federal Claims should assume jurisdiction and proceed on the merits." *Janowsky v. U.S.*, 31 Fed. C1. 520, 521 (1994).

### B. A Surety, Having Performed Pursuant To Its Payment Bond Obligations, Can Maintain An Action Against The United States For Wrongful Payment

This Court, of course, is bound to follow precedent of the Court of Appeals for the Federal Circuit and the Court of Claims. Those Courts have repeatedly held that the Tucker Act grants jurisdiction over a suit by a payment bond surety to recover contract funds that the Government owes under the bonded contract or that the Government wrongfully paid after notice from the surety.

In *United States Fidelity & Guaranty Co. v. United States*, 201 Ct.Cl. 1, 475 F.2d 1377 (1973), ("*USF&G")* the court explained why a payment bond surety can sue the United States while unpaid subcontractors and suppliers cannot:

> The surety then is subrogated to the rights of the contractor who could sue the Government since it was in privity of contract with the United States. The surety is likewise subrogated to the rights of the laborers and materialmen who might have superior equitable rights to the retainage but no right to sue the defendant.

(475 F.2d 1382).

*Balboa Insurance Co. v. United States*, 775 F.2d 1158 (Fed. Cir. 1985) involved a payment bond surety seeking to recover contract funds wrongfully paid by the Government. The Court noted that although other theories were possible, the traditional means for the surety to assert its claim was equitable subrogation and then quoted the above language from *USF&G* in rejecting the Government's contention "that a surety is similar to a subcontractor, who is not in privity of contract with the Government." (775 F.2d 1160).

In *United Electric Corp. v. United States*, 227 Ct.Cl. 236, 647 F.2d 1082, 1086 (1981), the Court reiterated that subcontractors cannot sue the United States and explained the surety's standing to sue under the Tucker Act as follows:

> [W]hile the surety gains equitable rights from its subrogation to the subcontractors' claims, its standing to sue (its ability to enforce those rights and others) comes from the fact that it is also subrogated to, and stands in the shoes of, the contractor, an entity which is clearly in privity of contract with the Government.

*International Fidelity Insurance Company v. United States*, 41 Fed.Cl. 706, 711 (1998) stated:

> It is settled law that the Tucker Act, coupled with the doctrine of equitable subrogation, provides subject matter jurisdiction to the court to determine a surety's claim against the government stemming from the alleged improper disbursement of contract funds.

Other cases allowing payment bond sureties to sue for contract funds held, or wrongfully paid, by the United States include *Home Indemnity Co. v. United States*, 180 Ct. Cl. 173, 376 F.2d 890 (1967); *Great American Insurance Co. v. United States*, 203 Ct.Cl. 592, 492 F.2d 821 (1974); *Fireman's Fund Insurance Co. v. United States*, 190 Ct.Cl. 804, 421 F.2d 706 (1970); *Argonaut Insurance Co. v. United States*, 193 Ct. Cl. 483, 434 F.2d 1362 (1970); *Hartford Fire Insurance Co. v. United States*, 40 Fed. Cl. 520 (1998); *International Fidelity Insurance Co. v. United States*, 25 Cl. Ct. 469 (1992); *United Pacific Insurance Co. v. United States*, 16 Cl. Ct. 555 (1989); *United States Fidelity & Guaranty Co. v. United States*, 16 Cl.Ct. 541 (1989); *Reliance Insurance Co. v. United States*, 15 Cl.Ct. 62 (1988); and *Integon Indemnity Corp. v. United States*, 12 Cl.Ct. 115 (1987).

Notwithstanding this deluge of authority, the Government argues in the instant case that the decisions discussed above, and the numerous similar cases allowing suit by a payment bond surety, were overruled, *sub silencio*, by *Insurance Company of the West v. United States*, 243 F.3d 1367 (Fed. Cir. 2001), (heretofor referred to as "*ICW*).

**1. The *Insurance Company of the West* Decision Is Consistent With Tucker Act Jurisdiction For Suits by a Payment Bond Surety.**

The Government argues that *ICW* stands for the proposition that sovereign immunity bars all Tucker Act suits by sureties other than sureties who have either signed takeover agreements with the Government or have financed completion of the defaulted contract (Government Motion, P. 5-9). However, the Government's test case for this argument was a claim filed by Insurance Company of the West ("ICW") to recover payments made to the contractor after ICW had requested, and the Government had agreed, that all future payments be mailed to ICW's address. ICW financed the contractor's completion of the work and had only a performance bond loss. There were several earlier cases granting judgment to the surety on almost identical facts,

and the only real issue in the case was the effect of *Dept. of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 119 S.Ct. 687, 1426 Ed.2d 718 (1999).

*Insurance Company of the West v. United States*, 243 F.3d 1367 (Fed. Cir. 2001) rejected the Government's arguments and held that there was a sovereign immunity waiver and Tucker Act jurisdiction for ICW's suit. First, the Court noted that *United States v. Aetna Casualty & Surety Co.*, 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171 (1949) established that the Anti-Assignment Acts do not bar subrogation claims and that a subrogee, standing in the shoes of someone for whose claim sovereign immunity has been waived, has the benefit of the waiver unless the waiver was expressly limited to the original claimant. The Court held that the Tucker Act waiver was for claims, not claimants, and extended to a surety subrogated to the contractor's rights.

In *ICW,* the Government also argued that under the doctrine of subrogation, the surety was subrogated only to the rights of the creditor it paid. In the context of a Miller Act performance bond, that creditor is the United States, and so the Government argued that the surety stood in the shoes of the United States, not those of the contractor. The Court rejected that argument based on *Balboa Insurance Co. v. United States*, supra., and *Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). The Court in *ICW* stated:

> The government also argues that even if sovereign immunity does not bar ICW's claim, this court's precedents have misapplied the doctrine of subrogation. The government cites *Pearlman* for the proposition that "a surety who pays the debt of another is entitled to all the rights of the person he paid," *Pearlman*, 371 U.S. at 137, 83 S.Ct. 232, and it argues that a surety that completes performance of a government contract would therefore step into the shoes of the government, not the contractor. We disagree. A contractor essentially owes the government a debt of performance, and a surety who completes performance pays the debt. We believe that *Balboa* correctly states the law of equitable subrogation. *Pearlman* stands for the proposition that the subrogee steps into the

> shoes both of the contractor against the government and the government against the contractor.

(Footnote 3, 243 F.3d 1375).

The Court was clearly correct in its understanding of *Pearlman* and *Balboa*. Indeed, *Pearlman* concluded:

> We therefore hold in accord with the established legal principles stated above that the Government had a right to use the retained fund to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it.

(371 U.S. 141, 83 S.Ct. 237).

If the contractor had completed the work and paid its bills, it would have been entitled to the contract funds, and the surety that paid the bills is subrogated to the contractor's rights, as well as to the rights of the Government and the persons paid. *Balboa*, of course, says the same thing. In rejecting the Government's contention that the surety was in the same position as a subcontractor or supplier, the *Balboa* Court stated, "The surety then is subrogated to the rights of the contractor who could sue the Government since it was in privity of contract with the United States." (775 F.2d 1161 quoting from *USF&G*, supra., 475 F.2d at 1382). For present purposes, it is crucial to note that both *Balboa* and *Pearlman* were payment bond cases. That is, the sureties' losses were only under their payment bonds. No performance bonds or performance bond losses were involved.

With that background, *ICW*'s *dicta* addressing the rights of payment bond sureties is clearly inconsistent with the Court's actual holding. The Court stated at 243 F.3d 1371:

> It is well-established that a surety who discharges a contractor's obligation to pay subcontractors is subrogated only to the rights

> of the subcontractor. Such a surety does not step into the shoes of the contractor and has no enforceable rights against the government.

This is *dicta* because there was no payment bond surety before the Court and no need to address the rights of a payment bond surety. The Court was demonstrably incorrect in terming its statement as "well-established." On the contrary, it conflicts with the numerous cases allowing payment bond sureties to sue the United States, with the very cases, *Balboa* and *Pearlman*, that the *ICW* Court later relied on to define the scope of the surety's subrogation rights, and with the holdings of *Balboa*, *USF&G* and other cases discussed above in which payment bond sureties were explicitly held to be subrogated to the rights of the contractor as well as to the rights of the subcontractors and suppliers.

The only authority cited by *ICW* in support of its statement was *United States v. Munsey Trust Co.*, 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947). The only issue in *Munsey Trust* was the Government's right of setoff. Neither sovereign immunity nor standing to sue was disputed. Indeed, Munsey Trust Company was the receiver for the contractor and sued in the contractor's name, albeit for the benefit of the surety. The issue was whether the Government could setoff a debt owed by the contractor on another job against the contract funds the Government owed on the bonded jobs. The Court held that the right of setoff prevailed. In *Pearlman,* the Court explicitly limited *Munsey Trust* to the setoff issue. *Pearlman* stated:

> The point at issue in that case [*Munsey Trust*] was whether the United States while holding a fund like the one in this case could offset against the contractor a claim bearing no relationship to the contractor's claim there at issue. We held that the Government could exercise the well-established common-law right of debtors to offset claims of their own against their creditors. This was all we held."

(371 U.S. 140, 83 S.Ct. 237)

If *Munsey Trust* is limited to setoff, it has no effect on the payment bond surety's ability to sue the United States. The Court in *Munsey Trust*, however, stated, "But nothing is more clear than that laborers and materialmen do not have enforceable rights against the United States for their compensation." (332 U.S. 241, 67 S.Ct. 1602, Emphasis supplied). In *USF&*G and *United Electric*, *supra*., the Court of Claims rejected attempts by subcontractors to sue the United States for contract funds, and in so holding considered the tension between *Munsey Trust* and the statement in *Pearlman* that the surety is subrogated to the right of the laborers and materialmen to be paid. As the Court stated in *USF&G*:

> It is a short step from *Pearlman* to infer that if the subcontractors have rights to which the surety may be subrogated, then the subcontractors should be able to assert their rights directly, which is in complete conflict with the language in *Munsey*, as recognized by Justice Clark's concurring opinion in *Pearlman*.
>
> The dilemma may be resolved in a number of ways, but the most apparent might be by noting that the Court in *Pearlman* stated that the surety was entitled to the benefit of *all* the rights of the laborers and materialmen whose claims it paid and those of the contractor whose debts it paid.

(475 F.2d 1382, Emphasis by the Court).

Thus, the Court of Claims rejected the reading of *Munsey Trust* upon which the *dicta* in *ICW* is based. The fallacy in the Government's reasoning in the instant case, and in the *dicta* in *ICW*, is the assumption that a payment bond surety is subrogated to only the rights of the subcontractors and suppliers. As is discussed above, the payment bond surety is subrogated to the rights of the contractor as well as those of the subcontractors and suppliers. In *ICW,* the Court did not purport to reinterpret *Pearlman*, *Balboa*, *USF&G*, or the numerous cases allowing payment bond sureties to sue under the Tucker Act. It had no reason to consider the subrogation rights of a payment bond surety at all.

The Federal Circuit remanded ICW's case to the Court of Federal Claims, and the Government argued on remand that the Federal Circuit's statement on the subrogation rights of a payment bond surety nullified the authority cited by ICW and limited the scope of sureties' equitable subrogation claims. In *Insurance Company of the West v. United States*, 55 Fed. Cl. 529, 534-538 (2003), Judge Miller discussed this contention in light of prior decisions and concluded, "Read against the foregoing precedent, the dicta in *West II* does not define the scope of a surety's rights under the doctrine of equitable subrogation." (55 Fed. Cl. 538).

On remand in *ICW*, the Government also argued that: (1) since the surety sued as subrogee of the contractor, it could not complain that payments were made to the contractor and (2) the surety's claim was barred by the release the contractor gave in return for the wrongful payment. The Court rejected these arguments because once the Government became a stakeholder of contract funds, it could not pay those funds to the wrong claimant and by doing so avoid liability to the right claimant. In the instant case, the Corps was notified numerous times that Lasker had failed to pay its subcontractors and even the Corps determined that no further payments were to be made to Lasker until Lasker got current with its subcontractors. Under the case law, the Corps was a stakeholder and paid Lasker at its own risk. In its decision following remand in the *ICW* case, the Court held:

> Accordingly, defendant has not shown that the contract payments made to PCE [the contractor], or the release executed between the defendant and PCE, preclude plaintiff from asserting a claim over which this court has jurisdiction.

(55 Fed. Cl. 540).

The Federal Circuit's *dicta* on the subrogation rights of payment bond sureties was inconsistent with the actual holding in the case, contrary to long standing precedent which the Court did not discuss or purport to overrule, and contrary to the holding of *Pearlman*. Cincinnati

respectfully suggests that this Court, like Judge Miller in her decision after the ICW case was remanded, should find that the *dicta* in *ICW* does not define the scope of a payment bond surety's subrogation rights.

**2. The Surety Can Enforce the Superior Equities of the Subcontractors It Paid.**

Although sovereign immunity bars unpaid subcontractors from suing the United States to enforce their equitable claim to the contract funds earned by their work, their equities still exist and are superior to any claim by the defaulting contractor. *Henningsen v. United States Fidelity & Guaranty Co.*, 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908), held:

> It [the surety] paid the laborers and materialmen, and thus released the contractor from his obligations to them, and to the same extent released the government from all equitable obligations to see that the laborers and supplymen were paid.

See also, *USF&G*, 475 F.2d at 1382 ("The subcontractors do possess equitable rights to the retained funds vis-a-vis other claimants to the money"); and *United Electric*, 647 F.2d at 1086 ("But the existence of equitable rights in subcontractors (as well as other laborers and materialmen) does not mean that they, too, can sue the United States . . .").

When the surety pays the subcontractors, it is subrogated to their superior equities and can claim the contract balances in preference to the defaulting contractor or anyone claiming through the contractor. At least since *Henningsen*, payment bond sureties have been held to have rights to contract funds superior to defaulting contractors' competing claims. In *Pearlman*, *supra.*, the Court rejected the argument that *Munsey Trust* changed the surety's equitable rights and stated:

> But the equitable rights of a surety declared in the Prairie Bank case as to sureties who complete performance of a contract were expressly recognized and approved in Munsey, and the Henningsen rule as to sureties who had not completed the contract but had paid laborers was not mentioned. Henningsen was not even cited in the

> Munsey opinion. We hold that Munsey left the rule in Prairie Bank and Henningsen undisturbed. We cannot say that such a firmly established rule was so casually overruled.

In *Blue Fox,* the Court thought that *Prairie State Bank*[1], *Henningsen*, and *Pearlman* were not authority for a sovereign immunity waiver, but it did not question that they correctly stated the relative equities of the contesting claimants. The Court did not overrule the three cases. It distinguished them as not addressing the issue before the Court – whether sovereign immunity barred Blue Fox's suit.

If sovereign immunity is waived, unpaid subcontractors can sue the Government for payment out of contract funds. Congress waived sovereign immunity for the United States Postal Service by authorizing it to sue and be sued, and *Kennedy Electric Co. Inc. v. United States Postal Service*, 508 F.2d 954 (10th Cir. 1974); *Active Fire Sprinkler Corp. v. United States Postal Service*, 811 F.2d 747 (2nd Cir. 1987); and *Wright v. United States Postal Service*, 29 F.3d 1426 (9th Cir. 1994) all allowed subcontractors to sue the Postal Service for contract funds.

The United States requires its construction contractors to pay the persons who furnish labor and material for use in performance of the contract. These persons can sue the contractor and its surety on the Miller Act payment bond, but the obligee of the bond is the United States. The contractor promises to the United States that the subcontractors, suppliers and laborers will be paid. In addition to the promise in the payment bond, the clause for Payments under Fixed Price Construction Contracts required by FAR §52.232-5 (48 C.F.R. §52.232-5) forbids payment to a contractor unless the contractor certifies in its request for payment that:

> All payments due to subcontractors and suppliers from previous payments received under the contract have been made, and timely payments will be made from the proceeds of the payment covered by this certification, in accordance with subcontract agreements and the requirements of chapter 39 of Title 31, United States Code.

[1] *Prairie State National Bank v. United States*, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896).

This contract clause implements the certification provision of the Prompt Payment Act, 31 U.S.C. §3903(b)(1)(B). A contractor that falsely certifies payment to its subcontractors and suppliers violates the payments clause and is subject to termination for default. *Lamb Engineering & Construction Co. v. United States*, 58 Fed. Cl. 106 (2003).

Finally, the Government has the right to use contract funds to pay the subcontractors and suppliers directly if the contractor fails to pay them. Indeed, the courts have urged the Government to make such payments when that is the only way to get the funds to the subcontractors and suppliers. *USF&G*, supra.; *Argonaut Insurance Co. v. United States*, *supra*.; *North Denver Bank v. United States*, 193 Ct. Cl. 225, 432 F.2d 466 (1970). In *Lamb Engineering & Construction Co. v. United States*, supra., the Court, citing *Pearlman*, agreed with the Government that it could make such payments ("As the defendant correctly points out, however, the government has the right to use retained funds to pay subcontractors.")

When the surety pays the subcontractors and suppliers, therefore, it satisfies the contractor's obligation to them, it satisfies the contractor's obligation to the Government, and it satisfies the Government's equitable duty to the subcontractors and suppliers. Thus, the Court in *Pearlman* held that the payment bond surety was subrogated to the right of the Government to use the contract fund to pay subcontractors, the right of the subcontractors to be paid out of the fund, and the right of the contractor to receive the contract fund once the subcontractors were paid and the work completed. (371 U.S. 141, 83 S.Ct. 237).

**3. Recent Court of Federal Claims Cases Do Not Support Defendant's Jurisdiction Argument.**

In two recent cases, the Court of Federal Claims considered similar suits by Miller Act sureties. Neither case supports the Government's position in this action that this Court lacks jurisdiction here.

In *United States Fire Insurance Co. v. United States*, 61 Fed. Cl. 494 (2004), the Court rejected the Government's argument that *Blue Fox* and *ICW* changed the long-standing right of sureties to sue under the Tucker Act. The Court stated at 61 Fed. Cl. 499:

> While the doctrine of subrogation has been recognized and applied for over a century as a basis for jurisdiction in this court, the defendant, nonetheless, questions its continued validity following . . . the decision in *Ins. Co. of the West v. United States*, 243 F.3d 1367. This court finds no basis for the defendant's position.

The Court also rejected the Government's argument that as a subrogee of the contractor, the surety could not complain that the contractor was paid money to which it was not entitled. 61 Fed. Cl. at 500-501.

Admittedly, the *U.S. Fire* case involved a performance bond surety, and presumably the Government will attempt to distinguish it on that basis. The Court's analysis, however, did not turn on a distinction between performance and payment bond sureties. Indeed, one of the cases the court relied upon was *Balboa*, which is a payment bond case. At the very least, the *U.S. Fire* opinion does not support the Government's argument in the instant case.

In *Insurance Company of the West v. United States,* 55 Fed. C1. 529 (2003), the Government argues in its Motion to Dismiss that the *ICW* decision limits sureties to only asserting the rights of subcontractors, and not contractors, against the Government.[2] However,

[2] To support this contention, the Government relied upon the following language from the *ICW* decision:

> "It is well-established that a surety who discharges a contractor's obligation to pay subcontractors is subrogated only to the rights of the subcontractor. Such a surety

the Court found that the government's heavy reliance upon *ICW* decision for this argument was insupportable and considered the Government's *ICW* reference to be mere *dicta* by the *ICW*. (55 Fed. Cl. at 535.) The Court went on to say:

> "Read against the foregoing precedent, the *dicta* in [*ICW*] do not define the scope of a surety's rights under the doctrine of equitable subrogation. When a surety, after financing or completing the performance of a defaulted contractor, discharges the outstanding claims of the subcontractors, it may subrogate to the rights of both the defaulted contractor and the subcontractors, *Balboa*, 775 F.2d at 1161; *USFG*, 201 Ct. C1. at 10, 475 F.2d at 1382. Because the subcontractors have no standing to sue the Government directly, the surety must invoke the contractor's right to sue in order to sustain its claim against the Government. Id. If a surety were limited to exercising the rights of only the subcontractors under the doctrine of equitable subrogation, the surety never would be able to recover directly from the contracting agency. Such a result would contradict a century of jurisprudence on equitable subrogation.
>
> Plaintiff has stated a claim under the doctrine of equitable subrogation to stand in [the contractor's] shoes and bring its claim directly against the Untied States. Accordingly, defendant's motion to dismiss based on the impact of [*ICW*] is denied.

55 Fed. Cl. at 530.

In its review of the *ICW* decision and its effect to a payment bond surety, the Court clearly and succinctly announced that a payment bond surety has standing to bring actions against the United States under the doctrine of equitable subrogation.

**4. Logic, Equity and Public Policy Support Rejection of the Government's Arguments.**

The Government argues that the bond is to protect the Government not the surety, and that the surety received a premium to take the risk that the contractor would default. That premium, however, was based on loss experience, and those losses reflected the long-standing

---

> does not step into the shoes of the contractor and has no enforceable rights against the government."

*ICW* at 1371.

case law that allowed the surety to assure that contract funds were not dissipated. For decades, a Miller Act surety has been able to notify the Government that the contractor defaulted in payments to its subcontractors and suppliers, and the Government is then responsible for withholding the final contract payment.[3]

The surety takes the risk that the cost to complete the work and pay the persons who provided labor and material for use in performance of the contract will exceed the contract price. If the contract funds are being diverted, however, it can stop further payments to the contractor by giving the Government notice of the contractor's default. The surety does not assume the risk that the Government will erroneously pay the contractor after notice of the contractor's default. The surety does not take the risk of losses caused by the Government's mistakes. If this well established rule has changed, sureties are not charging enough for Miller Act bonds. Their historical loss experience assumes the ability to protect the contract funds, and premiums are based on that experience.

The implications of the Government's argument, however, go beyond the facts of this case. Here, the Government was a stakeholder and paid the wrong claimant. The Government's jurisdictional argument, however, would equally bar a payment bond surety from suing for contract funds still held by the Government. The Government could retain the work and the money appropriated to pay for it. The contractor could not sue for the remaining contract funds because it defaulted by not paying its subcontractors and suppliers. The subcontractors and suppliers could not sue because the United States has not waived sovereign immunity for such a suit. If the surety also could not sue, the Government could simply keep the money.

[3] If the work is physically complete, the duty to withhold is absolute. If the work is not complete, the contracting officer can consider the Government's interest in having the work completed along with the surety's interest in preserving the contract funds. *Balboa*, supra.

The Government seeks to upset a fair and reasonable allocation of rights and responsibilities developed by the Courts and in place for many years. The contractor is obligated to pay for the labor and material used on the project. If he does not, he loses his right to receive additional contract funds. The surety, by paying for the labor and material, becomes entitled to the contract funds. The Government, however, is protected because its duty to withhold the funds is conditioned on the surety notifying it of the contractor's default and requesting that the funds be retained.

Subrogation is a creature of equity. It places one who pays a debt that should in equity and good conscience have been paid by another in a position to claim any security for satisfaction of the debt. Who ultimately receives the security, however, depends on the equities of the rival claimants.

The public policy of the United States is that its contractors pay persons furnishing labor and material on federal public works. Indeed, the Prompt Payment Act, *supra*., requires that the contractor certify that it has made such payments before additional funds are released. It would be contrary to that public policy to reward defaulting contractors by paying them in spite of their failure to pay their debts on the job. Such payments would be a windfall to the contractor at the expense of the Miller Act surety.

The long-standing rule is that the payment bond surety can protect contract funds by giving the Government notice of the contractor's default. This rule serves the public interest in assuring that contract funds are used to pay contract obligations, but without the ability to sue if the Government breaches its obligation the surety cannot enforce the rule. The Government could pay the wrong claimant, or even keep the money for itself, with impunity. Tucker Act

jurisdiction for suits by payment bond sureties is essential to protect the contract funds and the public interest.

C. Likewise, Defendant's Motion for Summary Judgment is Also Inappropriate and Must Be Denied**.**

**1. The Corps' Motion for Summary Judgment Must Be Denied Because the Corps Has Failed to Enter Most of the Evidence it Relies Upon in the Record.**

When moving for summary judgment, the moving party, "in order to prevail, will need to go beyond the pleadings, by use of evidence such as affidavits, depositions, answers to interrogatories and admissions, in order to demonstrate that a genuine issue for trial exists". *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553 (1986). In other words, the moving party must point to evidence in the record that supports its contentions. Here, the Corps has submitted an appendix of documents that are unsupported by any affidavit, deposition or other sworn testimony that would make the evidence of record. As a result, the vast majority of the evidence cited by the Corps cannot be relied upon by the Court in assessing whether this case is appropriate for summary judgment. For this reason alone, the Corps' motion should be denied.

**2. The Corps Cannot Meet the High Standards Necessary for Summary Judgment.**

The standards for summary judgment in this Court are patterned after those of Rule 56 of the Federal Rules of Civil Procedure.[4] Rule 56(c) of the Rules of Court of Federal Claims ("RCFC") requires that "in order for a motion for summary judgment to be granted, the moving party bears the burden of demonstrating that there are no genuine issues of material fact and that

---

[4] "In general, the rules of this court [the Court of Federal Claims] are closely patterned on the Federal Rules of Civil Procedure. Therefore, precedent under the Federal Rules of Civil Procedure is relevant to interpreting the rules of this Court, including Rule 56. *Thomas Creek Lumber and Log Co. v. United States*, 36 Fed.C1. 220, 234, note 13 (1996); *citing Jay v. Sec'y DHHS*, 998 F.2d 979, 982 (Fed. Cir. 1993); *Imperial Van Lines Intl. Inc. v. United States*, 821 F.2d 634, 637 (Fed. Cir. 1987); *Litchfield-Massaro, Inc. v. United States*, 17 C1.Ct. 67, 70 (1989).

the moving party is entitled to judgment as a matter of law.*"* *Thomas Creek Lumber and Log Co. v. United States*, 36 Fed. C1. 220, 234 (1996), *citations omitted*. "Summary judgment, however, will not be granted if 'the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury [trier of fact] could return a verdict for the non-moving party'." Id., *see also Uniq Computer Corp. v. United States*, 20 Cl.Ct. 222, 228-29 (1990). Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. Id., *citing Litton Indus. Prods. Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed. Cir. 1985); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed. Cir. 1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed. 2d 52 (1985).

**3. The Standard is Whether the Government Reasonably Exercised Its Discretion Conferred Upon It By Contract and Applicable Law/Regulations.**

Based upon their reading of *Balboa* decision, the Government contends that as long as it does not make payments in an arbitrary and/or capricious manner, it has no liability for not withholding payment from Lasker. However, the Government's reliance upon this verbage is taken out of context from the *Balboa* decision as the *Balboa* Court tempers its ruling by stating:

> "However, when a surety has informed the Government that the contractor is in default, the Government has an obligation to take reasonable steps to determine for itself that the contractor had the capacity and intention to complete the job.
>
> The following factors have been considered by the Court of Claims and other courts to be important in determining whether the Government has exercised reasonable discretion in distributing funds:
>
> (1) Attempts by the Government after notification by the surety, to determine that the contractor had capacity and intent to complete the job.

> (2) Percentage of contract performance completed at the time of notification by the surety.
>
> (3) Efforts of the Government to determine the progress made on the contract after notice by the surety.
>
> (4) Whether the contract was subsequently completed by the contractor.
>
> (5) Whether the payments to the contractor subsequently reached the subcontractors and materialmen (this goes to the equitable obligation of the Government to subcontractors and others to see that they will be paid; also because the surety is liable to the subcontractor, any money that reaches them furthers the objectives of the surety as well as those of the Government).
>
> (6) Whether the Government contracting agency had notice of the problems with the contractor's performance previous to the surety's notification of default to the Government.
>
> (7) Whether the Government's action violates one of its own statutes or regulations.
>
> (8) Evidence that the contract could or could not be completed as quickly or cheaply by a successor contractor.

775 F.2d at 1164.

In denying the Government's summary judgment, the *Balboa* Court found that evidence of one or more of these eight factors ". . could sustain a finding that the Government failed to reasonable exercise of the discretion conferred upon the contracting agency by the terms of the contract and the applicable law and regulations." 775 F.2d at 1164.

A few years later, the Federal Circuit in *National Surety Corps v. U.S.*, 118 F.3d 1542 (1997) appeared to simplify this inquiry regarding sureties by stating:

> "The duty devolves upon the government to administer the contract, during the course of performance, in a way that does not materially increase the risk assumed by the surety when the contract was bonded. [Citation omitted] . . . During performance of the contract, the Government has a duty to exercise its discretion responsibility to

> consider the surety's interest in conjunction with other problems encountered in the administration of the contract. 118 F.3d at 1546.

In *National Surety*, the construction contract stated the government would withhold 10% retainage until the contractor submitted a proper schedule. 118 F.3d at 1543. The contractor did not provide the requisite project schedule but the government still paid their retainage to the contractor. The contractor eventually defaulted and the surety completed the project. The surety later filed a claim for the retainage funds that should have been withheld by the Court but were instead paid to the contractor. In ruling for the surety, the Court found the contract's retainage provisions provide security for the performance of the bonded project and this requirement affects the surety's assessment of the risk involved. The Federal Circuit found the government liable for its improper release of retainage and liable to the surety because

> "Contract terms that provide security for the bonded performance cannot be ignored, waived, or modified without consideration of the surety's interests." 118 F.3d at 1547.

More recently, this Court has reaffirmed this standard that the government must reasonably exercise its discretion provided by the contract or law/regulations.

In *American Insurance Co. v. United States*, 62 Fed. Cl. 151 (September 28, 2004), the Court reviewed the government's duty to reasonably exercise its discretion and found that in an improper release of monies scenario, the government can be held liable to the surety if it can be shown ". . . that the government actually departed from the terms of its contract with the [bonded contractor]." 62 Fed. Cl. at 157. The Court held that the contract does not give the government "discretion" to depart from contract provisions that materially increase the surety's risk.

A few months ago, this Court again echoed the rule that the government owes the surety a duty to not materially increase the risk assumed by the surety and the government cannot

ignore, modify or waive contract terms that provide security for the bonded performance. *Cumbermans Mutual Cas. Co. v. United States*, 67 Fed. Cl. 253 (August 17, 2005).

Here, the Corps was on notice as of June 25, 2004 that Lasker has not paid at least three of its subcontractors on the Project, namely:

| **Subcontractor** | | **Amount Owed** |
|---|---|---|
| AAA Hoist & Crane Cleaning | | $ 6,664.00 |
| Comfort Systems USA | | 187,108.00 |
| Central Industrial Electric Co. | | 199,849.00 |
| | Total: | $389,621.00 |

However, Lasker's unpaid contract balance at that time was only $183,687.40. On June 26, 2004, the Corps properly advised Lasker that it would not process Lasker's Pay Applications until it has made proper payments to its subcontractors. However, the Corps made payment of $106,477.50 to Lasker on August 4, 2004 even though at least two of the above-named subcontractors were still owed substantial sums by Lasker on the Project. As of August 19, 2004, Comfort Systems was owed $173,730.20 by Lasker for the Project (see Exhibit 7) and as of August 17, 2004, Central Industrial Electric Company was owed $110,149.00 by Lasker for the Project (see Exhibit 7). As stated above, the surety as well as the Government has an interest in making sure subcontractors and suppliers get paid promptly and properly. Obviously, Lasker did not and could not provide proof that it had gotten "caught up" with its subcontractors before the Corps released payment to Lasker on August 4, 2004. Consequently, the Corps allowed the release of money to Lasker when the Corps knew Lasker was still not properly paying its subcontractors and falsely certifying to the Corps that they were being properly paid. Such actions by Lasker violate his contract with the Corps, the Prompt Payment Act, and the False Claims Act.

When a contractor wants to withhold money from a subcontractor, the mechanism is not to allow the contractor to get paid by the Owner for the subcontractor's work and then not pay the subcontractor. The proper way is by operation of FAR 52.232-5 so if payment to a subcontractor is to be withheld, the government is to hold the money, not the contractor. Like retainage provisions, this provision provides security for the bonded performance and protection for subcontractors that they will eventually get paid. However, by the time Lasker revised its Pay Application No. 10 and submitted it to the Corps on July 26, 2004, Lasker submitted nothing indicating that the above-named subcontractors had been properly paid or that there were any amounts to be deducted from Lasker's payment to comply with its FAR 52.232-5 obligations. Consequently, Lasker's certification was again false or "defective" and again, it was not a proper invoice pursuant to Clause 52.232-27 and should not have been paid.

Lastly, the Corps also violated their own payment procedures when they paid Lasker on August 4, 2004. The Corps' letter to Lasker dated June 26, 2004 states that Lasker's Pay Application No. 10 is not a "proper invoice" as required by Contract Section 00700, Contract Clause 52, 232-27. This FAR provision states:

> 52.232-27. Prompt Payment for Construction Contracts
>
> (2) Contractor's Invoice. The Contractor shall prepare and submit invoices . . . A proper invoice <u>must</u> include the items listed . . .If the invoice does not comply with these requirements, the designated billing office <u>must</u> return it within 7 days . . . with the reasons why it is not a proper invoice.
>
> . . .
>
> (viii) . . . substantiation of the amounts requested and certification in accordance with the requirements of the clause at 52.232-5, Payments Under Fixed-Price Construction Contracts.

(xi) Any other information or documentation required by the contract. (Emphasis added.)

Here, the Corps not only knew (or should have known) Lasker was not paying his subcontractors properly but knew his certification was false. Consequently, Lasker was paid despite the mandatory requirement that there must be payer certification and proper documentation evidencing payment to the subcontractors.

Lastly, the Corps asserts that the contract was not complete and FAR §28.106-7(a) requires the Corps to make payment despite subcontractors not being paid. However, the Project was substantially complete as of June 18, 2004 or at least by the time when the improper payment was made by the Corps to Lasker on August 4, 2004.[5] Even though this Court has previously found that FAR §28.106-7 does not recourse the government during performance to make payment after notification that the contractor is not paying its subcontractors (*General Accident Ins. Co. v. United States*, 19989 U.S. Claims Lexis 337 (1998), this Court has also found FAR §28.106-7 to be inapplicable to payments being made following substantial completion. *Reliance Ins. Co. v. United States*, 15 Cl. Ct. 62 (1988). See also *Appeal of Indiana Lumberman's Mutual Insurance Co., Inc.*, 92-3 BCA 25,065 (VABCA 1992), *Appeal of J.P. Inc.*, 90-1 BCA 22, 348 (ASBCA 1989).

Consequently, the government is not entitled to summary judgment because the Corps failed to reasonably exercise its discretion when it made payment to Lasker in derogation of the contract requirements and applicable law.

[5] The government's Exhibit 6 to its Motion is a form completed by the government to process Lasker's revised Pay Application No. 10. According to the government,

"Contract Substantially Complete & BOD on June 18, 2004."

Additionally, the government assessed liquidated damages through June 18, 2004.

## III. CONCLUSION

Cincinnati respectfully suggests that under binding precedent this Court has jurisdiction over its suit for contract funds wrongfully disbursed to the Corps to Lasker after being notified that Lasker had failed to pay its subcontractors along with other violations of the contract. For the foregoing reasons, Cincinnati respectfully requests that the government's Motion to Dismiss/Summary Judgment be overruled.

Dated: November 28th, 2005.

*s/ G. Bruce Stigger*
G. Bruce Stigger
Alber Crafton, PSC
Hurstbourne Place, Suite 1300
9300 Shelbyville Road
Louisville, KY 40222
Tel: (502) 815-5000
Fax: (502) 815-5005

*Attorney of Record for*
*Cincinnati Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that on November 28th, 2005, a copy of the foregoing Response Brief of Plaintiff Cincinnati Insurance Company to Defendant's Motion to Dismiss Or, In the Alternative, Motion for Summary Judgment was filed electronically. I understand that notice of this filing will be sent to counsel for all parties by the Court's electronic filing system. Parties may access a copy of this filing via the Court's electronic filing system.

*s/ G. Bruce Stigger*
G. Bruce Stigger