# In the United States Court of Federal Claims

**No. 03-2033C**
**(Filed: May 26, 2006)**

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * | * | |
| | * | |
| **COMMERCIAL CASUALTY INSURANCE COMPANY OF GEORGIA,** | * | |
| | * | |
| **Plaintiff,** | * | **Equitable Subrogation; Payment Bond Sureties; Sovereign Immunity** |
| **v.** | * | |
| | * | |
| **THE UNITED STATES,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * | * | |

*DeWitte Thompson,* Duluth, GA, for plaintiff.

*Doris S. Finnerman,* U.S. Department of Justice, Washington, DC, with whom were *Peter D. Keisler, Assistant Attorney General* and *Director David M. Cohen,* for defendant.

*Edward Graham Gallagher*, Vienna, VA, for *Amicus Curiae* Surety Association of America.

**O P I N I O N**

**FIRESTONE**, *Judge*.

Pending before the court is a motion by the defendant, the United States ("government" or "United States"), to dismiss the complaint of the plaintiff, Commercial

Casualty Insurance Company of Georgia ("plaintiff" or "Commercial Casualty"), for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"). The government contends that the plaintiff, a Miller Act, 40 U.S.C §§ 3131-3134 (2000 & Supp. 2002), surety of a government contractor who provided payment and performance bonds on a government construction contract, may not state a claim against the United States pursuant to the doctrine of equitable subrogation. In general, that doctrine provides that a surety who provides a bond guaranteeing the performance of a contract and who performs its obligations under that bond following contractor default may step into the shoes of another and assert that person's rights in seeking reimbursement of its costs. The government does not dispute that if the plaintiff had been called upon to take over and complete performance of the contract at issue pursuant to its performance bond obligations, then the plaintiff would be subrogated to the rights of the prime contractor. As a result, a performance bond surety would be able to step into the contractor's privity of contract with the government, and therefore would be able to rely on the waiver of sovereign immunity contained in the Tucker Act, 28 U.S.C. § 1491 (2000), to sue the United States for payment.

Instead, the government contends that because the plaintiff fulfilled its payment bond obligations and paid only subcontractors, the plaintiff is only subrogated to the rights of those subcontractors, who are not in privity of contract with the government and

who therefore cannot sue the United States under the Tucker Act for payment. Because the plaintiff is not in privity of contract with the government either, the government contends that the plaintiff may not sue the United States in this court for the contract funds the government continues to hold in connection with the completed contract. In the alternative, the government argues that it is entitled to summary judgment because the plaintiff has not fully paid all of the subcontractors' claims, and therefore the plaintiff may not assert a claim based on the doctrine of equitable subrogation.

The plaintiff and the amicus curiae, the Surety Association of America ("amicus" or "SAA"), argue that a payment bond surety, like a performance bond surety who takes over performance of a government contract, is subrogated to the rights of not only the subcontractors whom it pays, but also to the rights of the government contractor whose debt it pays, who is in privity with the government and, therefore, is able to sue the United States for payment.

For the reasons that follow, the court agrees with the plaintiff and amicus that a payment bond surety is subrogated to both subcontractors and the prime contractor, and therefore a payment bond surety may rely upon the prime contractor's privity of contract with the United States and may sue the United States under the Tucker Act, pursuant to the doctrine of equitable subrogation. The government's motion to dismiss is therefore **DENIED**. Based on representations made by the parties at oral argument, the court conditionally **DENIES** the government's motion for summary judgment as well.

## BACKGROUND

The following facts are undisputed unless otherwise noted.[1] On June 25, 2001, the United States Department of the Navy ("Navy") awarded Contract No. N62467-01-C-3215 to F.A.S. Development Company, Inc. ("FAS" or "contractor") to replace a 400Hz frequency converter at Naval Air Station Atlanta in Marietta, Georgia. On July 17, 2001, the plaintiff issued performance and payment bonds to FAS in the amount of $108,768. On January 10, 2002, the plaintiff notified the government of outstanding claims by "subcontractors and vendors on projects bonded by the surety" and requested that no payments be made to FAS. Def.'s App. 9.

On March 27, 2002, FAS and the Navy entered into bilateral modification P00001, which amended contract specifications, decreased the contract price from $108,768 to $52,625, and extended the contract completion date from October 9, 2001 to June 14, 2002. Subsequently, they entered into another modification, P00002, which extended the contract completion date from June 14, 2002 to July 24, 2002.

FAS requested that the contract balance be assigned to the plaintiff, but on July 31, 2002, the Navy informed FAS that its request for an assignment of the contract balance to the plaintiff was "unapproved." Def.'s App. 13. The stated reason was that the assignment would violate the Assignment of Claims Act. On August 2, 2002, the

[1] Because of the nature of the government's legal argument, the only fact that is material to the government's motion to dismiss is the fact that the plaintiff is a surety that fulfilled its obligations under its payment bond. Therefore the court has focused on undisputed facts, rather than the allegations of the plaintiff's complaint, in providing background.

plaintiff requested by letter that the Navy not release contract funds to FAS, but to instead pay the plaintiff as surety. In its letter, the plaintiff stated that it "[was] equitably subrogated to the contract funds through its payment of claims on this and other projects." Def.'s App. 17.

On August 19, 2002, the Navy issued a unilateral modification, P00003, which among other things reduced the contract price to $48,425. On September 10, 2002, FAS submitted a final invoice. The Navy has not paid FAS and continues to hold the $48,425 in contract funds.

By letter dated September 16, 2002, the plaintiff notified the Navy that it had received claims for payment from FAS's subcontractors upon the contract, FCX Systems, Inc. ("FCX") and Rogers Electrical Contractors, Inc. ("Rogers Electric"), and demanded that the Navy make payment to the plaintiff. The total amount of the claims made under the bond for this project was $37,209.

On July 31, 2003, the plaintiff sent a payment to Hatmaker and Associates, a debt collection agency hired by FCX, in the amount of $25,644, for the labor and materials that FCX provided on the contract. This payment was made pursuant to the payment bond issued by the plaintiff. The plaintiff has not paid any money to Rogers Electric; the plaintiff denied Rogers Electric's claim for payment based on untimeliness.

The plaintiff filed a complaint in this court on September 2, 2003. Oral argument on the government's motion to dismiss or in the alternative for summary judgment was

held on April 28, 2006.[2]

## DISCUSSION

### I. Motion to Dismiss

#### A. Standard for Decision

The government has filed a motion to dismiss for failure to state a claim, although it argues that this court does not have jurisdiction over the plaintiff's claim. While the plaintiff's complaint states a type of claim over which this court generally has jurisdiction, the government argues that this court does not have jurisdiction over the plaintiff's particular claim under the facts alleged here, and thus seeks dismissal for failure to state a claim. See Fisher v. United States, 402 F.3d 1167, 1172-73 (Fed. Cir. 2005).

"[I]t is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson,

---

[2] Oral argument in this case was consolidated with the argument in two companion cases, Capitol Indemnity Corp. v. United States, No. 04-1478C, and Cincinnati Insurance Co. v. United States, No. 05-751C. The government presented a single argument regarding privity and jurisdiction and therefore the resolution of that issue is the same for all three cases.

355 U.S. 41, 45-46 (1957). As noted above, the government's motion to dismiss presents a legal question.

**B. Payment Bond Sureties May Rely upon the Privity of Contract Between the United States and the Prime Contractor to Sue the United States**

**1. A Payment Bond Surety Steps into the Shoes of the Prime Contractor**

The government argues that because the plaintiff only fulfilled obligations under its payment bond, it is subrogated only to the rights of subcontractors and therefore cannot sue the United States. The government relies extensively on the following language in an opinion by the Court of Appeals for the Federal Circuit, Insurance Co. of the West v. United States, 243 F.3d 1367 (Fed. Cir. 2001) ("ICW"): "It is well-established that a surety who discharges a contractor's obligation to pay subcontractors is subrogated only to the rights of the subcontractor. Such a surety does not step into the shoes of the contractor and has no enforceable rights against the government." Id. at 1371 (citing United States v. Munsey Trust Co., 332 U.S. 234, 240-41 (1947)). The government contends that ICW sets forth an accurate statement of the law and that payment bond sureties do not step into the shoes of prime contractors, who are in privity with the United States, and therefore payment bond sureties may not sue the United States.

The government has made this argument based on ICW in two other recent cases before this court, Nova Casualty Co. v. United States, 69 Fed. Cl. 284 (2006) and Liberty

Mutual Insurance Co. v. United States, 70 Fed. Cl. 37 (2006). Judges Lettow and Block, respectively, thoroughly examined the language in ICW and each concluded that (1) the above-quoted language in ICW was non-binding dicta[3] and (2) under long-standing precedent, a payment bond surety steps into the shoes of both the subcontractor and the prime contractor. This court adopts their well-reasoned, thoughtful analysis of those issues, without unnecessary repetition. The court agrees with her colleagues that the above-quoted language in ICW was non-binding dicta and did not alter the binding law on the doctrine of equitable subrogation, which had previously held that payment bond sureties are subrogated to the rights of both subcontractors and prime contractors.

Without repeating the full analysis in Nova and Liberty Mutual, the court agrees with the conclusion of those courts that both the Supreme Court and the Federal Circuit have long recognized that payment bond sureties and performance bond sureties are subrogated to the rights of the prime contractor. Prior to the Supreme Court's decision in Munsey Trust, on which the ICW Court relied, the Supreme Court had treated the subrogation rights of performance bond sureties and payment bond sureties the same. See Prairie State Nat'l Bank of Chicago v. United States, 164 U.S. 227 (1896); Henningsen v. United States Fidelity & Guaranty Co., 208 U.S. 404 (1908). Therefore, whatever rights

[3] While the court in ICW did state that a payment bond surety is subrogated "only to the rights of the subcontractor" and not to the prime contractor, 243 F.3d at 1371, there were no claims of payment bond sureties before the court. This statement therefore was "unnecessary to the decision in the case" and must be considered to be non-binding dicta. Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1307 (Fed. Cir. 2004) (quoting Black's Law Dictionary 1100 (7th ed. 1999)), quoted in Nova Casualty Co., 69 Fed. Cl. at 296 n.12.

performance bond sureties had vis-a-vis the United States, payment bond sureties would have them as well. Then, in Munsey Trust, the Supreme Court for the first time distinguished between performance bond and payment bond sureties by holding that if the government has any unrelated claims against the contractor, it may set-off those claims against any contract funds retained by the government prior to disbursing the fund to the subrogated payment bond surety. 332 U.S. at 244. A subrogated performance bond surety, in contrast, would be entitled to the fund without set-off. See id. (noting that the government suffers damage when the contract is not completed, but not when the work is complete but the laborers and materialmen have not been paid).

The Supreme Court addressed this distinction between payment and performance bond sureties in Pearlman v. Reliance Insurance Co., 371 U.S. 132, 140 (1962), by expressly limiting the holding in Munsey Trust to its facts.[4] In Pearlman, the retained contract funds were submitted to the contractor's bankruptcy estate, and the payment bond surety claimed that it was entitled to priority with regard to the fund over the general creditors who sought to share equally in the contractor's assets.[5] Acknowledging the

---

[4] Moreover, as noted in Nova, the Restatement (Third) of Suretyship and Guaranty has abandoned the "Munsey Trust doctrine" of set-off in order to prevent unjust enrichment of the contractor; otherwise the surety's performance of its obligations would "free the [contractor] of two claims - its duty pursuant to the underlying obligation and its duty pursuant to the separate claim." Restatement (Third) of Suretyship and Guaranty § 31 cmt. d (1996). See also Nova, 69 Fed. Cl. at 293 n.7.

[5] As a result, sovereign immunity was not at issue in Pearlman. Nevertheless, it is binding authority on the law of equitable subrogation.

potential conflict between Munsey Trust on one hand and Prairie State and Henningsen on the other hand, with regard to the rights of payment versus performance bond sureties, the Pearlman Court stated that there is no fundamental distinction between the rights of a payment bond surety and a performance bond surety, except with regard to the right of set-off authorized in Munsey Trust. Id. at 139-140. The Court held that Prairie State and Henningsen "establish the surety's right to subrogation in such a [retained] fund whether its bond be for performance or payment. Unless this rule has been changed, the surety here has a right to this retained fund." 371 U.S. at 139. Thus the payment bond surety was entitled to priority over the general creditors with regard to the fund.

Despite this, the government relies on Pearlman for the proposition that a payment bond surety is only subrogated to the rights of the subcontractors whom it pays. The government relies on the Court's statement of the general rule as "a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed." 371 U.S. at 137. The government argues that the Supreme Court held that a payment bond surety is only subrogated to the person it pays in cash, i.e., the subcontractors. However, the Supreme Court in Pearlman expressly stated that a payment bond surety is subrogated to the rights of not only the subcontractors it pays but also to the rights of the prime contractor and the government, with regard to retained funds.

> We therefore hold in accord with the established legal principles stated above that the Government had a right to use the retained fund to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety,

> having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it.

Id. at 141.

Thus, contrary to the government's contention, Pearlman does not stand for the proposition that the surety is only subrogated to the rights of the person who it pays in cash. Rather, Pearlman provides that a payment bond surety, by paying the prime contractor's debts to subcontractors, pays the subcontractors, "pays" the United States by performing the prime contractor's obligations under the contract, and "pays" the prime contractor by paying its debt to the subcontractors. It is for this reason that the Pearlman Court concluded that the payment bond surety is subrogated to the rights of all three parties. 371 U.S. at 141. See also ICW, 243 F.3d at 1375 n.3 ("A contractor essentially owes the government a debt of performance, and a surety who completes performance pays that debt."). In each of these instances the surety fulfills an obligation that is owed to that party. That is what Pearlman meant by the "person he paid." Thus, a payment bond surety "pays" the prime contractor's debt to the subcontractors within the meaning of Pearlman and therefore is subrogated to the prime contractor's rights.

The Court of Claims and then its successor, the Court of Appeals for the Federal Circuit, have repeatedly affirmed the rule of equitable subrogation articulated in Pearlman. First, in United States Fidelity & Guaranty Co. v. United States, 475 F.2d 1377 (Ct. Cl. 1973) (en banc) ("USF&G"), the Court of Claims, en banc, rejected a narrow reading of Pearlman and instead held that any remaining conflict between

Pearlman and Munsey Trust should be resolved in favor of the payment bond surety's right to recover. The USF&G Court stated that:

> [T]he Court in Pearlman stated that the surety was entitled to the benefit of all the rights of the laborers and materialmen whose claims it paid and those of the contractor whose debts it paid. The surety then is subrogated to the rights of the contractor who could sue the Government since it was in privity of contract with the United States. The surety is likewise subrogated to the rights of the laborers and materialmen who might have superior equitable rights to the retainage but no right to sue the defendant.

Id. at 1382.

Later, the Federal Circuit in Balboa Insurance Co. v. United States, 775 F.2d 1158 (Ct. Cl. 1985), reiterated the holding in USF&G and expressly rejected the government's contention that the payment bond surety is in the same position as that of a subcontractor: lacking privity of contract with the government, it cannot sue the government in this court. Instead, the Court held that a payment bond surety could not only sue the United States for retained contract funds, it could sue the United States to recover wrongly disbursed progress payments, as well. Id. at 1162 ("[W]e can discern no reasonable basis for the Government's distinction between retainages and progress payments . . . ."). In addition, as the Liberty Mutual court correctly notes, in subsequent cases the Federal Circuit has repeatedly reaffirmed the view that a surety may sue the United States, without distinguishing between performance and payment bonds. See, e.g., Fireman's Fund Ins. Co. v. England, 313 F.3d 1344, 1351 (Fed. Cir. 2002) ("Our case law has long established that a surety can sue the Government in the Court of Federal Claims under the

non-contractual doctrine of equitable subrogation."); First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1289 (Fed. Cir. 1999); Nat'l Sur. Corp. v. United States, 118 F.3d 1542, 1545-46 (Fed. Cir. 1997).[6] Contra Admiralty Constr., Inc. v. Dalton, 156 F.3d 1217, 1222 (Fed. Cir. 1998) (citing Aetna Cas. & Sur. Co. v. United States, 845 F.2d 971, 975 (Fed. Cir. 1988)) ("[T]o maintain a claim for equitable subrogation, a surety must either take over contract performance or finance the completion of the defaulted contract under its performance bond.").[7]

In view of this authority, the court agrees with the holdings in Nova and Liberty Mutual that a payment bond surety is equitably subrogated to the rights of both the subcontractors whom it pays and the prime contractor whose debt it pays when it fulfills its payment bond obligations.

The court also agrees with the holdings in Nova and Liberty Mutual that sovereign immunity is not a bar to an action by a payment bond surety when it is standing in the shoes of the prime contractor. As the Nova and Liberty Mutual courts discuss in great

---

[6] Indeed, in ICW, the Federal Circuit stated that it "believe[d] that Balboa correctly states the law of equitable subrogation." 243 F.3d at 1375 n.3.

[7] The government relies on Admiralty Construction in arguing that a surety must have performed obligations under its performance bond in order to assert the doctrine of equitable subrogation. Although Admiralty Construction did hold that, in so doing the only case it relied upon was Aetna. In Aetna the court did make a distinction between the rights of sureties under performance and payment bonds, but that was because the government asserted a right to set-off a tax claim against the contract funds: "Aetna concedes that if it expended these funds because of its payment bond obligations, 'the IRS would have priority to the remaining proceeds.'" 845 F.2d at 974. Thus, in view of all the other authority that either performance or payment bond sureties may assert the doctrine of equitable subrogation, the government's reliance on Admiralty Construction is unpersuasive.

detail, it is plain that in ICW the Federal Circuit resolved that when a surety steps into the shoes of the prime contractor, the surety may rely on the prime contractor's rights under the Tucker Act to sue the United States. Importantly, the Federal Circuit rejected the government's contention, which is now essentially repackaged here, that under Department of the Army v. Blue Fox, Inc., 525 U.S. 255 (1999), a surety may only sue the government if it has entered into a contract with the government, giving it a direct basis for claiming privity of contract with the government. Instead, the Federal Circuit held that "a subrogee, after stepping into the shoes of a government contractor, may rely on the waiver of sovereign immunity in the Tucker Act and bring suit against the United States." ICW, 243 F.3d at 1375. The court reasoned that sovereign immunity had been waived because the Tucker Act "waiv[es] sovereign immunity as to claims, not particular claimants." 243 F.3d at 1373-74. Thus, under the reasoning of ICW, as long as the payment bond surety is subrogated to the rights of the prime contractor, the surety may sue the United States in this court pursuant to the Tucker Act.[8] Because the court has

---

[8] It is because of ICW that the government's continued reliance on Blue Fox is misplaced. At bottom, the government argues that no case holds that there has been a waiver of sovereign immunity for the claims of payment bond sureties against the United States. The government argues that the one case that squarely dealt with the issue of sovereign immunity for payment bond sureties, Balboa, relied upon Prairie State, Henningsen, and Pearlman. However, the government argues, Blue Fox held that these three cases did not involve a waiver of sovereign immunity for claims by sureties and therefore the government argues that a payment bond surety cannot rely on Balboa for such a waiver. What the government misunderstands is that the plaintiff does not rely on Balboa, it relies on ICW. ICW resolved the problem created by Blue Fox by holding that a subrogee of a government contractor may sue the United States. Under ICW, if a payment bond surety is subrogated to the rights of the prime contractor, then it can sue the United States based on the Tucker Act's waiver of sovereign immunity for contractors.

resolved that the payment bond surety has stepped into the prime contractor's shoes and is subrogated to the rights of the prime contractor, the payment bond surety may rely on the prime contractor's privity and sue the government.

**2. A Payment Bond Surety Asserts the Prime Contractor's Contract Claim Against the Government**

The government argues that even if a payment bond surety is subrogated to the rights of both the subcontractor and the prime contractor for purposes of determining priority to a retained contract fund in a bankruptcy estate, as was the case in Pearlman, in the context of a suit against the government for funds still in the government's possession the surety must be asserting a contract claim of the prime contractor in order to qualify for the Tucker Act's waiver of sovereign immunity. The government argues, based on the reasoning in ICW that the Tucker Act "waiv[es] sovereign immunity as to claims, not particular claimants," 243 F.3d at 1373-74, that the payment bond surety must not only be subrogated to the prime contractor's right to sue the United States, it must be asserting a claim of the prime contractor under the contract in order to come under the holding in ICW.

Based on this reading of ICW, the government argues, a payment bond surety's claim fails. The government argues that because the prime contractor has defaulted on its obligations under the contract, the prime contractor has relinquished its claim against the government for reimbursement for the payment of subcontractors. Therefore, the government argues, because the prime contractor cannot have a claim, the payment bond

surety does not have a claim that it may assert against the government within the meaning of ICW.

Even assuming that the surety must be asserting a contract claim of the prime contractor, the government's argument does not hold up upon careful scrutiny. A prime contractor who fails to pay its subcontractors may be able to state a claim to retained contract funds, even though on the merits the prime contractor may not be entitled to priority in the fund over other claimants.

Contrary to the government's assertions, the prime contractor does not lose its right to make a claim against the government simply because a surety steps in and pays subcontractors. When a surety steps in and performs or pays for work, the government receives all it is entitled to under the contract – completed performance. For purposes of the contract between the government and the prime contractor, it is as if the prime contractor completed performance. Therefore, under the express terms of the contract, the government would be obligated to pay the prime contractor. While in the equitable subrogation cases it is often said that the prime contractor is "in default," this does not necessarily mean that as a matter of law the prime contractor has no rights to payment under the contract, particularly where, as here, the prime contractor has not been terminated for default. Thus, at the very least, the prime contractor may state a claim against the government for the retained contract funds.

The fact that the prime contractor does not enjoy priority to the remaining contract

funds vis-a-vis other potential claimants does not mean that the prime contractor does not have any claim to the funds that the surety may then assert. If the prime contractor is not ultimately entitled to the funds, then the prime contractor's claim fails on the merits. The prime contractor's failure to prevail on the merits of its claim does not mean, however, that the prime contractor does not have a claim in the first instance. The government has waived sovereign immunity for suits by contractors for payment. The payment bond surety is equitably subrogated to the prime contractor's claim for payment. Thus, the payment bond surety, as subrogee of the prime contractor, may state the contractor's claim to the retained fund in the government's possession. Under ICW, because the surety is asserting a claim of the contractor, it may sue the United States pursuant to the waiver of sovereign immunity contained in the Tucker Act. Moreover, once the surety is in this court, it may also, as subrogee, assert the rights of the subcontractors and of the United States in claiming priority to the fund.[9] See USF&G, 475 F.2d at 1382 (holding that a surety is subrogated to the rights of the prime contractor and the subcontractor, "who might have superior equitable rights to the retainage but no right to sue the

[9] Indeed, it is usually the surety's reliance on its subrogation to the rights of the United States that results in its becoming entitled to a retained fund. See Prairie State, 164 U.S. at 232-33; Henningsen, 208 U.S. at 410; Restatement (Third) of Suretyship & Guaranty § 27 (1996) ("Upon total satisfaction of the underlying obligation, the secondary obligor [i.e., the surety] is subrogated to all the rights of the obligee [i.e., the government] with respect to the underlying obligation."); Restatement (Third) of Suretyship & Guaranty § 28 (1996) ("[T]he secondary obligor may enforce, for its benefit, the rights of the obligee as though the underlying obligation had not been satisfied . . . against any interest in property securing . . . the obligation of the principal obligor . . . .").

defendant"). This is true even if the contractor's claim ultimately fails on the merits.

Indeed, in Munsey Trust the Supreme Court noted that the Court of Claims had jurisdiction "[i]nsofar as the suitor [a receiver asserting the rights of a surety] in the Court of Claims asserted the contractor's title to the sum in dispute." 332 U.S. at 240. After holding on the merits that the government could exercise a right of set-off against the contractor's claims, the Court went on to consider the priority of the subcontractors' and the United States' rights in the fund, to which the surety argued it was also subrogated, as well as any rights the surety itself had in the fund. Id. Thus, rejection of the contractor's claim of priority on the merits does not affect the surety's ability to state the contractor's claim in this court and sue the United States for the retained contract funds, in which the United States, as a mere stakeholder, no longer has a right.[10]

This result is consistent with the policy of equitable subrogation. The very purpose of the doctrine of equitable subrogation is to provide a way for the obligee, here

---

[10] Nor is the result any different if the government no longer possesses a retained fund because the government improperly disbursed payment to the contractor after the surety notified the government that the contractor was in default. At the time the surety notifies the government of a contractor default, under the law of the Federal Circuit the government is a mere stakeholder in the remaining contract funds. See Balboa, 775 F.2d at 1162 ("[U]pon notification by the surety of unsatisfied claims of the materialmen, the Government became a stakeholder with respect to the amount not yet expended under the contract that it holds at the time of notification of default."). Because the government is a mere stakeholder, its subsequent payment to the contractor cannot alone satisfy or release the contractor's claim. Someone other than the contractor may be entitled to assert the claim and therefore an adjudication of the parties' rights is needed. See Ins. Co. of the West v. United States, 55 Fed. Cl. 529, 540 (2003) ("The Government cannot forward the theory that it has discharged its duty under the contract, thereby depriving the Court of Federal Claims of jurisdiction, when it has . . . perform[ed] acts which render it a stakeholder."). Therefore, even when the surety seeks recovery for a wrongfully disbursed progress payment, it is capable of asserting the contractor's claim to the contract funds.

the government, to pay the person who actually performed the obligations under the contract, rather than the person who is supposed to be paid under the express terms of the contract but who in fact did not perform its obligations. See Restatement (Third) Suretyship & Guaranty ch. 3 Intro. Note (1996) (describing the subrogation right as "designed to effectuate the core principle that it is the principal obligor rather than the secondary obligor that should ultimately bear the cost of performance associated with fulfilling the obligations owed to the obligee."). Although the surety is entitled to reimbursement from the prime contractor under suretyship law, often in these situations the prime contractor is insolvent. Therefore, if the obligee were to pay the prime contractor the surety would never be reimbursed. Thus, equitable subrogation provides a mechanism to cut out the contractor and pay the surety directly. To hold that the surety may not sue the obligee would defeat this equitable purpose.[11]

In view of the foregoing, a government contractor who fails to pay its subcontractors generally may state a claim against the United States for any retained funds in the government's hands. A payment bond surety who pays the subcontractors' claims is a subrogee of the prime contractor and, as the Federal Circuit in ICW expressly

---

[11] Moreover, the government's argument that payment bond sureties' claims should not be heard in this court because the government may not be able to protect itself or other claimants is ultimately unpersuasive. The government's concerns about paying contract funds to sureties without any other claimants present in the litigation can easily be addressed through this court's third party practice. See RCFC 22 ("[I]n those cases where the United States is in the position of a stakeholder facing the risks of double liability, RCFC 14 [Third Party Practice] provides the means for summoning a third party.").

held, "a subrogee, after stepping into the shoes of a government contractor, may rely on the waiver of sovereign immunity in the Tucker Act and bring suit against the United States." 243 F.3d at 1375. The plaintiff, who fulfilled obligations under its payment bond, may therefore rely on the waiver of sovereign immunity in the Tucker Act.[12] The government's motion to dismiss is denied.

## II. Motion for Summary Judgment

In the alternative, the government argues that as a matter of law, the plaintiff may not assert the doctrine of equitable subrogation because it did not fully pay all of the subcontractors' claims. The government argues that the plaintiff is not entitled to subrogation because it is undisputed that the plaintiff did not pay one of its subcontractors. In particular, the government argues that the claim of Rogers Electric was never paid, and that the plaintiff delayed denying this claim until after the statute of limitations had run. The government therefore argues that as a matter of law the plaintiff is not entitled to subrogation. "Until this surety undertakes to pay all of the outstanding claims owed by [the contractor], it will not be permitted to share in retainages still held by

---

[12] Finally, the court notes that the government's arguments apply with equal force to equitable subrogation claims by a performance bond surety, who the ICW Court concluded could sue the government. The performance bond surety has not "paid" the prime contractor, and yet the government acknowledges that the performance bond surety may still assert the prime contractor's claim. Similarly, when the performance bond surety takes over performance of the contract, the prime contractor loses its "claim" to reimbursement, but under ICW the performance bond surety is still able to stand in the prime contractor's shoes to obtain relief. At bottom, the government's reliance on ICW to draw a distinction between performance and payment bond sureties is unfounded.

the Government." USF&G, 475 F.2d at 1381.

The plaintiff admits that it has not paid the Rogers Electric claim, explaining that the claim was submitted beyond the Miller Act's statute of limitations. See 40 U.S.C. § 3133(b)(4). However, the plaintiff and the SAA represented at oral argument that they would ensure that the plaintiff pays the Rogers Electric claim so that it would not bar the plaintiff's recovery.

In view of the plaintiff's representation, the government's motion for summary judgment is denied. However, this denial is conditioned upon the plaintiff filing a receipt from Rogers Electric indicating that it has been paid in full within 60 days. See N. Denver Bank v. United States, 432 F.2d 466, 467 (Ct. Cl. 1970).

## CONCLUSION

For the reasons stated above, the government's motion to dismiss is **DENIED**. The government's motion for summary judgment is also **DENIED** on the condition that the plaintiff file a receipt from Rogers Electrical Contractors, Inc. indicating that its claim has been fully paid within 60 days of the date of this decision.

**IT IS SO ORDERED.**

**s/Nancy B. Firestone**
NANCY B. FIRESTONE
Judge